**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

ADC Telecommunications, Inc.,

Plaintiff,

v.

**MEMORANDUM OPINION AND ORDER**
Civil No. 01-477 ADM/AJB

Panduit Corp.,

Defendant.

---

Albert L. Underhill, Esq., and Mark D. Schuman, Esq., Merchant & Gould, P.C., Minneapolis, Minnesota, appeared for and on behalf of the Plaintiff.

Daniel A. Boehnen, Esq., and Nicole A. Fiorella, Esq., McDonnell Boehnen Hulbert & Berghoff, Chicago, Illinois, and Russell S. Ponessa, Esq., Hinshaw & Culbertson, Minneapolis, Minnesota, appeared for and on behalf of the Defendant.

---

## I. INTRODUCTION

Plaintiff ADC Telecommunications, Inc. ("ADC"), filed a complaint against Defendant Panduit Corporation ("Panduit"), alleging that Panduit's products infringe four of ADC's design patents and three of ADC's utility patents. On January 11, 2002, the undersigned United States District Judge heard the parties' claim construction arguments and Panduit's Motion for Summary Judgment [Doc. No. 39]. For the reasons set forth below, the claims are construed as stated and the Motion for Summary Judgment is denied.

APR 24 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## II. BACKGROUND

ADC manufactures and sells products related to a routing management system for fiber optic cables used in the telecommunications industry. Within office buildings containing telecommunications equipment, fiber optic cables must be routed among pieces of equipment. Troughs, appearing like rain gutters, provide pathways for large volumes of the fiber optic cable and protect them from outside obstructions that might cause damage to the cables. Various types of fittings connect the troughs. The fittings and trough sections have smooth internal curves, insuring that the fiber optic cables are not bent to a degree further than their "minimum bend radius," the radius below which the fiber optic might break. ADC holds utility and design patents relating to its fiber optic routing products.

Panduit also manufactures and sells products relating to the routing of fiber optic cable in telecommunications installations. Panduit's FiberRunner™ product line, introduced in June, 2000, is at issue in this case. ADC argues that Panduit changed its products to more closely resemble ADC's products, appropriating ADC's "look" to gain market advantage. ADC thus alleges that Panduit's products infringe four ADC design patents.

ADC's U.S. Patent No. Des. 320,782 (issued Oct. 15, 1991) ("the '782 patent") claims "[t]he ornamental design for a guiding trough downspout for optical fibers, as shown and described" in the accompanying Figures 1-6. ADC alleges that Panduit's FiberRunner™ Vertical Tee Fitting infringes the '782 patent.

ADC's U.S. Patent No. Des. 321,682 (issued Nov. 19, 1991) ("the '682 patent") claims "[t]he ornamental design for a guiding trough 90 degree down elbow for optical fibers, as shown" and described in the accompanying Figures 1-7. ADC alleges that Panduit's FiberRunner™

Outside Vertical Right Angle Fitting infringes the '682 patent.

ADC's U.S. Patent No. Des. 334,380 (issued March 30, 1993) ("the '380 patent") claims "[t]he ornamental design for a guiding trough, 90° horizontal elbow for optical fibers, as shown and described" in the accompanying Figures 1-7. ADC alleges that Panduit's FiberRunner™ Right Angle Fitting infringes the '380 patent.

ADC's U.S. Patent No. Des. 327,874 (issued July 14, 1992) ("the '874 patent") claims "[t]he ornamental design for a guiding trough 45° horizontal elbow for optical fibers, as shown and described" in the accompanying Figures 1-7. ADC alleges that Panduit's FiberRunner™ Horizontal 45° Angle Fitting infringes the '874 patent.

ADC further alleges that Panduit infringes three utility patents: U.S. Patent No. 6,192,181 B1 (issued Feb. 20, 2001) ("the '181 patent"), U.S. Patent No. 5,316,243 (issued May 31, 1994) ("the '243 patent"), and U.S. Patent No. 5,752,781 (issued May 19, 1998) ("the '781 patent"). These three patents require claim construction.

## III. DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A genuine issue of material fact does not exist "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant has the burden of showing that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant meets its Rule 56(c) burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). When weighing the evidence offered by the parties on a motion for summary judgment, this Court must review the evidence and all inferences drawn from that evidence in the light most favorable to the party opposing the motion. *See Matsushita*, 475 U.S. at 587. The nonmovant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.

An infringement analysis requires two steps: (1) claim construction to determine the scope and meaning of the asserted claims, and (2) a comparison of the properly construed claims with the allegedly infringing device to determine whether the device embodies every limitation of the claims. *See Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). Claim construction is a matter of law for the court. *See id.* at 1456. Whether the accused device infringes a claim, either literally or under the doctrine of equivalents, is a question of fact. *See Insituform Technologies, Inc. v. Cat Contracting, Inc.*, 161 F.3d 688, 692, (Fed. Cir. 1998). Thus, to grant a motion for summary judgment based on noninfringement, the court must determine that no reasonable jury could find infringement. *See IMS Technology, Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000) (citing *Voice Technologies Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 612 (Fed. Cir. 1999)).

**A. Claim Construction**

Patent claims must be construed to determine their scope and meaning. Proper claim

construction requires an examination of the claims of the patent language itself, the specifications, and the prosecution history. *See Hockerson-Halberstatdt, Inc. v. Avia Group Intern., Inc.*, 222 F.3d 951, 955 (8th Cir. 2000); *Burke, Inc. v. Bruno Independent Living Aids, Inc.*, 183 F.3d 1334, 1339 (Fed. Cir. 1999). In addition, "[t]he court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Karlin Technology, Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971 (Fed. Cir. 1999). "Claim interpretation begins with the language of the claim itself." *National Recovery Technologies, Inc. v. Magnetic Separation Systems, Inc.*, 166 F.3d 1190, 1195 (Fed. Cir. 1999) (citing *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 619 (Fed. Cir. 1995)). The terms of a claim are given their ordinary meaning and accustomed meaning as understood by one of ordinary skill in the art, unless the inventor intended that the terms should be construed otherwise. *Hockerson-Halberstatdt*, 222 F.3d at 955; *Karlin Technology*, 177 F.3d at 971. Claim language must be construed in light of the specification. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed Cir. 1996); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) ("Claims must be read in view of the specification, of which they are a part."), *aff'd*, 517 U.S. 370 (1996). However, in viewing the specification to construe claim terms, care must be taken to avoid reading limitations appearing in the specification into the claim. *Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (citations omitted).

**1. The '181 Patent**

The '181 patent is titled "Optical Cable Exit Trough." It includes three claims directed to a method of assembling a cable routing system, involving the steps of providing a lateral trough section, mounting a cable exit trough to the top edge of the lateral trough section, and routing cable upwardly and transversely to reach the cable exit trough. ADC asserts that Panduit's spillover junction infringes claims 1 and 2 of the '181 patent. Claim 1 reads:

> 1. A method of assembling a cable routing system comprising the steps of:
> providing a lateral trough section;
> mounting a cable exit trough to a top edge of the lateral trough section;
> routing a cable from the lateral trough section upwardly and transversely to the exit trough.

The parties dispute only the language "mounting a cable exit trough to a top edge of the lateral trough section." A "cable exit trough" is properly understood as a channel through which cable exits the lateral trough section. Contrary to ADC's arguments, the term "cable exit trough" does not include any bend radius control features. No such features appear in the claim.

The term "top edge" is not defined in the '181 patent to have any meaning other than its ordinary meaning. The word "top" is ordinarily known as "the highest point, level, or part of something." Webster's Third New International Dictionary, 2409 (unabridged ed. 1968). An "edge" is commonly understood to be the "relatively thin surface or side of any object bounded by plane surfaces." *Id.* at 722. A "top edge" is defined as "the narrow surface or side of a thin object." New Shorter Oxford English Dictionary, 784 (Thumb Index ed. 1993). Applying these ordinary meanings to the '181 patent, the term "top edge" means a narrow, uppermost surface of the sidewall that is parallel to the floor of the tough. The specification supports this interpretation, distinguishing between the side wall of the trough section and the "top edge." In

Figure 1 and Figure 4 of the '181 patent, the sidewall is indicated by reference number 24, while the top edge is indicated by reference number 30. *See* Fiorella Decl., Ex. 1; *see also* the '181 patent, col. 2: 62-63 ("Side 24 includes a top edge 30."). Thus, the "top edge" does not include the side surfaces of the lateral trough walls.

The proper construction of "mounting . . . to" is addressed next. Panduit argues that the term "mounting" requires that the exit trough be in contact with and rest upon the top edge, noting that the plain language of the claim is "mounting . . . to." ADC contends that the term "mounting" does not require the exit trough to be resting upon the top edge, but that it means attached to the top edge. However, ADC's construction implicitly presupposes an overly expansive meaning of "top edge," which is rejected as previously explained. The proper construction is that the term "mounting . . . to" requires the exit trough to be affixed to and in contact with the top edge of the lateral trough section.

**2. The '243 Patent**

The '243 patent describes a coupler used to connect troughs and fittings used to route fiber optic cables. The coupler joins two troughs without drilling holes and inserting bolts. Instead, the coupler uses springs located within pockets to snap the ends of two troughs together and secure them. ADC accuses Panduit of infringing claims 1 and 2 of the '243 patent, and terms in those claims require construction.

The "alignment means," "clamp means," and "resiliently biased spring means" limitations are recited in claim 1, and the "grip means" limitation is recited in claim 2 of the '243 patent. Such patent claims may be written in "means plus function" language pursuant to 35 U.S.C. § 112, ¶ 6, which states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. Use of the word "means" creates a presumption that the inventor used the term advisedly to invoke § 112, ¶ 6. *Sage Products, Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427 (Fed. Cir. 1997). This presumption may be rebutted if the claim goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function. *See id.* at 1428; *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524 (Fed. Cir. 1996). Once it is established that a means-plus-function limitation is present, the limitation must be construed, thereby determining what the claimed function is and what structures disclosed in the written description correspond to the "means" for performing that function. *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1360 (Fed. Cir. 2000). The description of some structure in a means plus function element does not preclude the applicability of § 112, ¶ 6. *Laitram v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991).

**a. Alignment Means**

Regarding the alignment means, claim 1 provides in pertinent part:

> aligning means for aligning the first and second ones in a predetermined alignment with said cable pathway aligned with said coupling pathway . . .
>
> said alignment means including first and second outer walls and first and second inner walls spaced from said first and second outer walls, respectively, by a distance to define first and second pockets, respectively, sized to receive said first and second sidewalls, respectively, of said elements, said inner and outer walls disposed for said elements to be in said predetermined alignment when said sidewalls are disposed between said outer and inner walls of said coupling . . . .

The '243 patent, claim 1.

The term "means" triggers the presumption that § 112, ¶ 6 applies. The function of the alignment means is recited as "aligning the first and second ones in a predetermined alignment with said cable pathway." *Id.* The claim also describes some of the structure that comprises the alignment means. However, the claim fails to recite sufficient structure, material, or acts for performing the function of alignment. Although claim 1 recites first and second outer walls, and first and second inner walls, the claim fails to describe an outer bottom wall, an inner bottom wall, and a spacing rib. Such elements are necessary for the aligning function of the coupling. Thus, because the claim fails to recite sufficient structure to perform the function, the presumption that § 112, ¶ 6 applies is not rebutted.

The specification of the '243 patent recites the coupling as having internal side walls and an internal bottom wall, as well as outer side walls and an outer bottom wall. *See* the '243 patent, at col. 3: 19-23. The outer walls are spaced from the inner walls "to define a generally U-shaped space, which includes side wall spaces 57 and bottom wall space 59." *Id.* at col. 3: 25-29. Properly construing the language, the "alignment means" element of claim 1 requires a continuous "double wall" construction, consisting of a pair of continuous internal and external walls defining first and second pockets between the walls. These act to align the attachment ends of the elements to be coupled. The first and second pockets refer to the U-shaped space formed. The figures of the '243 patent confirm this construction, illustrating continuous U-shaped inner walls surrounded by continuous U-shaped outer walls and a continuous U-shaped space between them.

The prosecution history also confirms this interpretation. After a rejection of its pending

claims, ADC responded,

> claim 1 (twice amended) calls for a coupling having inner and outer walls defining a pocket which receives the walls of the cable pathway-defining elements and urges the pathway-defining elements against the wall and with the spring carried completely within the pocket defined by the first and second opposing walls.

Fiorella Decl., Ex. 11, Response to Final Office Action of June 23, 1992. The Examiner again rejected claim 1. In response, ADC further amended claim 1, and argued that the cited prior art did not include "inner and outer walls defining enclosed pockets." *Id.* Ex. 12, Response to Final Office Action of June 16, 1993. ADC again asserted that "claim 1 calls for a coupling having inner and outer walls defining a pocket which receives the walls of the cable pathway defining elements . . . ." *Id.*

Accordingly, the "alignment means" element of claim 1 is properly construed as requiring a continuous outer wall and a continuous inner wall defining an enclosed pocket sized to receive the wall of the cable-pathway defining element. The continuous inner and outer walls must be spaced from each other by a distance approximating the thickness of the wall of a cable pathway defining element. The spacing between the inner and outer walls defines a continuous U-shaped enclosed pocket between the first and second inner and outer walls to receive the side walls and bottom wall of the elements.

**b. Clamp Means**

With respect to the clamp means, claim 1 provides in pertinent part:

> clamp means for automatically clamping an attachment end when in said predetermined alignment; . . .
> said clamp means includes first and second resiliently biased spring means carried

> on said coupling and disposed within said first and second pockets, respectively, and directed to urge an element wall against a wall of said coupling upon insertion of said element wall between said outer and inner walls . . . .

The '243 patent, claim 1.

Again, the use of the word "means" invokes a presumption that § 112, ¶ 6 applies. The function of the clamp means is "for automatically clamping an attachment end when in said predetermined alignment." *Id.* The claim fails to recite sufficient structure, material, or acts for performing the function of clamping. To perform this function, the clamp means requires "leaf springs 61 that include first and second halves 62, 64 disposed on opposite sides of spacing rib 56." *Id.* at col. 3: 63-65. The springs 62, 64 are biased toward the internal walls 48, and have terminal ends 65, "which are bent back to permit a leading end of the attachment ends to be inserted into the space 57." *Id.* at col. 3: 66 - col. 4: 1. Because additional structural limitations are required for the clamp means to perform its function, claim 1 fails to recite sufficient structure to perform the function. *See Unidynamics Corp. v. Automatic Products Intern., Ltd.*, 157 F.3d 1311, 1319 (8th Cir. 1998); *Laitram Corp.*, 939 F.2d at 1536 ("The recitation of some structure in a means-plus-function element does not preclude the applicability of § 112, ¶ 6 [when it] merely serves to further specify the function of the means."). The presumption that § 112, ¶ 6 applies is not rebutted.

The specification of the '243 patent describes the leaf springs as entirely placed within the spacing between the inner and outer walls. The specification calls for "leaf springs 61 placed within side space 57 on opposite sides of the coupling." The '243 patent, at col. 3: 59-62. The figures of the '243 patent confirm this interpretation.

The prosecution history provides further support for this construction. In response to a rejection, ADC asserted that the claim "calls for a coupling having inner and outer walls defining a pocket . . . with the spring carried completely within the pocket defined by the first and second opposing walls." Fiorella Decl., Ex. 11, Response to Final Office Action of June 23, 1992. ADC argued that both the inner and outer walls enclosed the spring means. ADC is bound by its own previous explanations in support of establishing the claim.

The proper construction of the clamp means is as a means-plus-function element to automatically clamp the attachment end in the coupler. The clamp means element includes resiliently biased spring means in the form of resiliently biased leaf springs disposed in the first and second pockets. The spring means must be entirely enclosed within the pockets and, therefore, must be entirely between the inner and outer walls of the alignment means. In order to be resiliently biased, the spring means must be under the influence of spring forces before the wall of the cable pathway defining element is inserted into the coupler.

**c. Resiliently Biased Spring Means**

Regarding the resiliently biased spring means, claim 1 provides in pertinent part:

> first and second resiliently biased spring means carried on said coupling and disposed within said first and second pockets, respectively, and directed to urge an element wall against a wall of said coupling upon insertion of said element wall between said outer and inner walls . . . .

The '243 patent, claim 1.

The use of the word "means" creates the presumption that § 112, ¶ 6 applies once again. The language "directed to urge an element wall against a wall of said coupling upon insertion of said element wall between said outer and inner walls" recites the function of the spring means.

The remainder of the claim does not describe a structure, but explains the relationship between the spring means and other claim elements. The language in claim 1 recites insufficient structure to rebut the presumption that § 112, ¶ 6 applies. *See Unidynamics*, 157 F.3d at 1319.

The language of claim 1 requires that the spring means be "resiliently biased." The phrase "resiliently biased spring" indicates that a spring is being held in a stressed state, as distinct from a relaxed state. The claim also states that the spring is "directed to urge" the trough wall against the wall of the coupling, indicating that the spring is already under stress. ADC argues that the term should be construed as "a flexibly slanted spring." ADC's proposed interpretation renders the words "resiliently biased" meaningless and removes the qualification from the claim. The proper construction of "resiliently biased spring" is a spring that is under stress even before the trough wall is inserted into the coupler.

This construction is supported by the figures and specifications of the '243 patent. The specification describes springs "biased toward the internal walls" of the coupler. The '243 patent, at col. 3: 66. Upon insertion of the trough end into the coupling, the trough walls "force the springs away from" the internal walls. *Id.* at col. 4: 1-3. Figures 5-7 illustrate a leaf spring that is in contact with the opposite wall of the coupler prior to insertion of the trough wall. A sufficient amount of spring bias is required to provide adequate clamping strength to hold the trough wall.

**d. Grip Means**

With respect to the grip means, claim 2 provides in pertinent part:

A system according to claim 1, wherein said spring means includes grip means for

> gripping the wall of said element within said coupling.

The '243 patent, claim 2.

The use of the word "means" creates the presumption that § 112, ¶ 6 applies. The language in claim 2 fails to recite sufficient structure to overcome the presumption that § 112, ¶ 6 applies. The proper construction of the grip means is as a means-plus-function element. The grip means are "cutout tabs" in the body of the leaf springs, angled away from the surface of the spring to cut into the wall of the trough element. *See id.* at col. 4: 4-15.

**3. The '781 Patent**

The '781 patent involves an improved coupling for joining trough members in a fiber optic cable routing system. The improved coupling is easier to install and disassemble than prior couplings. ADC has accused Panduit of infringing the '781 patent. Some terms require claim construction.

**a. Fastener system**

With respect to the fastener system, claim 1 provides in pertinent part:

> a fastener system positioned on said wall guide and including a bracket disposed to oppose said external surface when said terminal end is received within said spacing . . . .

The '781 patent.

The dispute over this phrase centers on the term "wall guide." ADC argues that the wall guide is the structure that supports and defines the guiding surfaces. The wall guide includes, ADC contends, the inner and outer walls of the coupling, but is not limited to those surfaces. According to ADC, "a fastener system positioned on [the] wall guide" includes a fastener system

positioned on the stop wall or any other portion of the coupling that supports and defines the guiding surfaces, not merely the first and second guiding surfaces.

Panduit responds that the fastener system must be positioned on one of the guide walls that constitute the wall guide. The wall guide consists of the combination of two opposed surfaces that act to guide the trough wall into the coupler. The claim itself describes the wall guide as "having first and second guiding surfaces spaced apart by a spacing sized to receive said wall thickness . . . ." *Id.* Panduit emphasizes that nowhere in the specification or the prosecution history is the central enforcing rib described as being a part of the wall guide. The "central reinforcing rib" is described as extending around the exterior of the coupling. *See id.* at col. 3: 55-57. The central enforcing rib is distinct from the wall guide.

Panduit's construction of "a fastener system positioned on [the] wall guide" is accepted. This phrase means that the fastener system must be positioned on one of the guide walls that constitute the wall guide. The fastener system must include a bracket, disposed to oppose the external surface of the trough wall when the trough wall is inserted in the coupler. Therefore, the bracket must be positioned on the outer guide wall. The fastener system must not be positioned on a central rib.

The prosecution history supports this interpretation. In distinguishing prior art references, ADC amended the claims of the '781 patent to specify that the fastener system must be positioned on the wall guide. *See* Fiorella Decl., Ex. 13, Response to Office Action of September 18, 1997, at 2-3. After taking the position that its pending claims were allowable because the fastener system was located on the wall guide, ADC may not now retreat from this

language.

**b. Bracket**

Claim 1 requires a "bracket disposed to oppose [the] external surface" of the trough wall when the trough wall is inserted into the coupler. Panduit argues for a construction that the bracket must be positioned on the wall guide, at a position opposite the trough wall when the trough wall is inserted into the coupling. ADC contends that only some portion, but not all, of the bracket must be located opposite the external surface of the trough wall when the trough wall is inserted. ADC insists that there is no requirement that the *entire* bracket be opposite or against the external surface of the trough wall. ADC's position is persuasive. The proper construction of a "bracket disposed to oppose" is that at least some portion of the bracket is located opposite the external surface of the trough wall when the trough wall is inserted into the coupler. The claim does not require all of the bracket to oppose the trough wall.

**c. Axially drivable fastener**

With respect to the axially driveable fastener, claim 1 provides in pertinent part:

> an axially driveable fastener carried on said bracket in a first position to provide unobstructed passage of said terminal end past said fastener and into said spacing, said fastener axially driveable into said spacing and toward said first guiding surface to a second position with said fastener penetrable into said wall thickness, said fastener sized so as to not penetrate through said first guiding surface.

The '781 patent.

ADC argues that an axially driveable fastener is a fastener which is movable along an axis and is supported by the bracket. According to ADC, this term should be interpreted as a fastener which moves in a line with the axis of the fastener. ADC's interpretation does not

require rotation of the fastener.

Panduit maintains that the fastener, like a screw, must rotate about a central axis when driven. Panduit argues that the claim describes a self-tapping screw that may be withdrawn to allow passage off the trough wall past the fastener into the guide wall space and advanced to enter the spacing, partially penetrating the trough wall to secure the trough. Panduit points to the deposition testimony of ADC's Engineering Manager, Gary Nault. When asked the meaning of the term "axially driveable fastener," he responded, "that's a very good description of a screw." Fiorella Decl., Ex. 14, at 123-24. Panduit's position represents the proper construction of "axially driveable fastener," a fastener that rotates about a central axis when driven.

**4. The Design Patents**

There is an inherent problem in applying *Markman* claim construction analysis to design patents. Absent from a design patent is any disputed language to construe. A patented design is defined by the drawings and figures in the patent. *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450 (Fed. Cir. 1993). There generally are no words describing the design.

Undaunted, the Federal Circuit instructs that a "proper interpretation of [ADC's] claimed design focuses on the visual impression it creates." *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 104 (Fed. Cir. 1996). Setting down into words what visual impression is created by a fitting for plastic troughs carrying fiber optic cables is a remarkably different endeavor than describing one's visual impression of Rembrandt's "The Syndics of the Drapers' Guild."[1]

---

[1] A painting frequently misidentified as "Bench Meeting."

ADC alleges that it designed a system of trough sections and fittings to provide a streamlined and aesthetically pleasing appearance. *See* Steinman Dep., at 118-19; Henneberger Decl., ¶¶ 6-8. ADC claims to have achieved this aesthetic goal by incorporating a "dual raceway" of ribs on the underside of the trough sections and fittings. Since routing systems are generally installed overhead at ceiling height, the most visibly prominent feature is the bottom of the troughs and fittings. The design of the ribs is to evoke a sense of continuous dual race tracks running along the seamless routing of fiber optic cables.[2] The dual raceway design was added to the fittings so that when they are coupled to the trough sections, the dual raceways have a continuous, uniform appearance.

Seeking to invalidate[3] ADC's design patents, Panduit argues that the designs claimed by the '782, '682, '380, and '874 patents include no ornamental features and that the designs as a whole are primarily functional. The visual impression Panduit observes is not one of aesthetics, but one of pure function.[4] Panduit argues that ADC's continuous, uniform dual raceways running along the bottoms of all the troughs and all the fittings serve primarily a functional purpose.

---

[2] ADC's failure to identify, in accordance with Magistrate Judge Boylan's Pretrial Scheduling Order of June 1, 2001, the rounded corner at the bottom of the walls on the outside of the trough as an ornamental feature precludes ADC from raising this new theory of ornamentation.

[3] For the discussion of invalidity, see *infra*, § III.C.

[4] Interestingly, when Panduit introduced its new FiberRunner™ product line on June 1, 2000, it highlighted the aesthetics of its new system, stating that it had achieved a "sleek look and robust profile," that would "ensure an appealing installation strong enough to perform under extreme conditions." FiberRunner™ Press Release.

Panduit identifies the dual raceway's functional purposes of alignment, strength, and ease of installation. Factual issues permeate Panduit's contentions, which are best left for resolution by the fact-finder. *See infra*, § III.C. Panduit may not transition a claim construction argument into a summary judgment argument for invalidity due to functionality.

ADC's design patent claims are and remain "[t]he ornamental design for [the respective patents], as shown and described" in the accompanying Figures of the patents. *See* the '782 patent; the '682 patent; the '380 patent; the '874 patent. A picture is its own best description. This Court can neither rewrite those claims, nor say, as a matter of law, that ADC's designs were produced for primarily functional considerations, irrespective of aesthetic concerns. The design claims are interpreted as being limited to their overall ornamental visual impression, as conveyed in the respective Figures of the design patents, including among the ornamental features a "dual raceway" of ribs.

**B. Infringement**

A design patent only protects the novel, ornamental features of the patented design. *See KeyStone Retaining Wall*, 997 F.2d at 1450. Design patent infringement is a question of fact, and a patentee must prove infringement by a preponderance of the evidence. *See L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993). During the comparison step of the infringement analysis, a fact-finder must determine "whether the patented design as a whole is substantially similar in appearance to the accused design." *OddzOn Products, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997). The patented and accused designs do not have to be identical for the fact-finder to find design patent infringement. *Id.* The appearance of a

design as a whole controls the question of infringement. *Id.*

If the overall appearance of the designs are dissimilar, then there can be no infringement based on the similarity of specific features. The Supreme Court articulated the test:

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 528 (1871). The non-functional, ornamental features of the design aspects are pertinent to a determination of infringement.

In addition to the substantial similarity requirement of *Gorham*, design patent infringement requires that the accused product "appropriate the novelty in the patented device which distinguishes it from the prior art." *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1444 (Fed. Cir. 1984) (quoting *Sears, Roebuck & Co. v. Talge*, 140 F.2d 395, 396 (8th Cir. 1944)). Thus, the patentee must prove both substantial similarity and appropriation of the "point of novelty." *Shelcore, Inc. v. Durham Indus., Inc.*, 745 F.2d 621, 628 n.16 (Fed. Cir. 1984).

Panduit may not be granted summary judgment if, when viewed in the light most favorable to ADC, there is evidence creating genuine issues of material fact and upon which the jury could reasonably find infringement. ADC has presented evidence that Panduit's products are substantially similar to ADC's design patents. ADC's expert, Danny Cunagin, President and CEO of a product design consulting firm, opines that Panduit's products and ADC's design patents would be substantially similar in the eyes of an ordinary observer and purchaser. *See* Cunagin Decl., ¶¶ 1, 8-9. Ordinary observers and purchasers view fiber optic trough products as

they are installed at telecommunications sites. *Id.* The fiber optic cable management systems are combined in a "Lego-like" fashion and hung from brackets near the ceilings of such sites. *Id.* Thus situated, the perspective of ordinary observers and purchasers is to view the bottom of the system. *Id.* ADC's "dual raceway" pattern of ribs design is a predominant feature of its fiber optic cable management system, as seen from below by the ordinary observer and purchaser looking upward. *Id.* ADC's expert opinion, that an ordinary observer and purchaser would confuse Panduit's products with ADC's products, creates a triable issue of fact.

ADC identifies the "dual raceway" pattern of ribs along the bottoms of the ducts and fittings as the point of novelty that Panduit has appropriated. A comparison of Panduit's products with ADC's patents demonstrates that there is sufficient evidence upon which a jury could find a substantial similarity between the two regarding this point of novelty. Both have prominent dual raceway ribs on the bottom surface. *Compare* Fig. 5 from the '380 patent, *with* Schuman Decl., Ex. F (Panduit's horizontal 90° fitting); *compare* Fig. 3 from the '682 patent, *with* Schuman Decl., Ex. H (Panduit's vertical 90° fitting); *compare* Fig. 5 from the '874 patent, *with* Schuman Decl., Ex. G (Panduit's horizontal 45° fitting); *compare* Fig. 5 from the '782 patent, *with* Schuman Decl., Ex. I (Panduit's vertical "T" fitting). ADC has presented evidence to create genuine issues of material fact relating to the question of whether Panduit's products infringe ADC's design patents.

**C. Invalidity**

Panduit argues that ADC's design patents are invalid because they are functional, rather than ornamental. "When evaluating a motion for summary judgment, the court views the record

evidence through the prism of the evidentiary standard of proof that would pertain at a trial on the merits." *Eli Lilly & Co. v. Barr Laboratories, Inc.*, 222 F.3d 973, 980 (Fed. Cir. 2000). Under the patent statutes, a patent enjoys a presumption of validity that can be overcome only through clear and convincing evidence. *See* 35 U.S.C. § 282 (1994); *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1563 (Fed. Cir. 1997). "Invalidity due to functionality is an affirmative defense to a claim of infringement of a design patent, and must be proved by the party asserting the defense." *L.A. Gear*, 988 F.2d at 1123. Thus, as the moving party seeking to invalidate a patent on summary judgment, Panduit must submit clear and convincing evidence of invalidity, such that no reasonable jury could find otherwise. *Eli Lilly*, 222 F.3d at 980.

Design patents are directed to the appearance of an article of manufacture and are limited to designs that are primarily ornamental. *L.A. Gear*, 988 F.2d at 1123. If the patented design is primarily functional rather than primarily ornamental, the patent is invalid. *Id.* ("If the particular design is essential to the use of the article, it can not be the subject of a design patent."). A design is deemed to be functional when the appearance of the claimed design is "dictated by" the use of the article. *Id.* To determine whether a design is "primarily functional or primarily ornamental," the claimed design must be viewed in its entirety, because the ultimate question is not the functional or decorative aspect of each individual feature, but the overall appearance of the design. *Id.* In determining whether the design is ornamental, it is relevant "whether functional considerations demand only this particular design or whether other designs could be used, such that the choice of design is made for primarily aesthetic, non-functional purposes." *Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1460 (Fed. Cir. 1997).

Whether the features of a design are functional or ornamental is an issue of fact.[5] *See Hupp*, 122 F.3d at 1460-61 (reversing jury finding of "not ornamental" for lack of substantial evidence). Panduit has not met its burden of proving that ADC's design patents are invalid because they are primarily functional. It cannot be said, as a matter of law, that clear and convincing evidence proves the design at issue was the result of primarily functional considerations, without regard to aesthetic concerns.

Issues of fact remain, such as whether the dual raceway design primary serves an alignment function, whether the dual raceway design primarily serves function of strength, whether the dual raceway design primarily serves function of easy installation, and whether alternative designs are as efficient and as cost effective as ADC's dual raceway. The Motion for Summary Judgment is denied. *See Five Star Mfg., Inc. v. Ramp Lite Mfg., Inc.*, 44 F.Supp.2d 1149, 1156 (D. Kan. 1999) (finding sufficient evidence to create a genuine issue of material fact, precluding summary judgment, as to whether the features of the design were primarily ornamental or functional).

---

[5] In the context of validity under the Lanham Act, the similar issue of functionality has been consistently treated as a question of fact. *See Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1039 (11th Cir. 1996); *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983); *Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 775 (9th Cir. 1981).

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

(1) The patent claims are to be construed as set forth in § III(A) of this Order; and

(2) Panduit's Motion for Summary Judgment [Doc. No. 39] is **DENIED**.

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Dated: April 24, 2002