**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

ADC Telecommunications, Inc.,

Plaintiff,

v.

Panduit Corp.,

Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 01-477 ADM/JGL

---

Alan G. Carlson, Esq., Philip P. Caspers, Esq., Timothy A. Lindquist, Esq., and Samuel A. Hamer, Esq., Merchant & Gould, P.C., Minneapolis, Minnesota, appeared for and on behalf of the Plaintiff.

Daniel A. Boehnen, Esq., and Anthoula Pomrening, Esq., McDonnell Boehnen Hulbert & Berghoff, Chicago, Illinois, Russell S. Ponessa, Esq., Hinshaw & Culbertson, Minneapolis, Minnesota, and Robert A. McCann, Esq., Panduit Corp., Tinley Park, Illinois, appeared for and on behalf of the Defendant.

---

## I. INTRODUCTION

On August 30, 2002, the parties in the above-entitled matter came before the undersigned United States District Judge for oral argument on Defendant Panduit Corp.'s ("Panduit") Motions for Summary Judgment with respect to three ADC Telecommunications, Inc. ("ADC") patents [Docket Nos. 86, 89, 92]. For the reasons set forth below, Panduit's Motion for Summary Judgment as to U.S. Patent No. 6,192,181 B1 [Docket No. 89] is granted in part and denied in part, Panduit's Motion for Summary Judgment as to U.S. Patent No. 5,316,243 [Docket No. 92] is denied, and Panduit's Motion for Summary Judgment as to U.S. Patent No. 5,752,781 [Docket No. 86] is granted.

DEC 1 1 2002
FILED ____________
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD ________
DEPUTY CLERK ________

## II. BACKGROUND

ADC commenced this action against Panduit alleging infringement of four design patents and three utility patents. Panduit moved for summary judgment [Docket No. 39] of non-infringement and invalidity of the design patents. In its April 24, 2002 Memorandum Opinion and Order ("Markman Order") [Docket No. 64], this Court denied Panduit's motion and rendered claim construction on all patents. The three utility patents are the subjects of Panduit's instant Motions for Summary Judgment.

Both ADC and Panduit manufacture and sell products for carrying and routing fiber optic cable used in telecommunications. In communication systems, cables travel between pieces of telecommunications equipment. The cables generally run in channels, called "troughs," located above the equipment, with different types of fittings connecting one trough to the next, and guide structures routing the cables down to equipment below. At issue in the present Motions are ADC's utility patents: U.S. Patent No. 6,192,181 B1 (issued Feb. 20, 2001) ("the '181 patent"), U.S. Patent No. 5,316,243 (issued May 31, 1994) ("the '243 patent"), and U.S. Patent No. 5,752,781 (issued May 19, 1998) ("the '781 patent").

## III. DISCUSSION

### A. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine dispute of material fact is present when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court must view the evidence in the

light most favorable to the nonmovant and make all permissible inferences in its favor. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

### B. INVALIDITY AND NON-INFRINGEMENT OF THE '181 PATENT

In a fiber optic cable system, the cables are routed from overhead troughs down to telecommunication equipment below. The '181 patent, ADC's "Optical Cable Exit Trough," describes an invention for a trough fitting directed to route the cables out of lateral troughs and downward. See The '181 patent, Abstract (ADC Ex. 19). This "exit trough" is mounted to the top of the sidewall of the horizontal trough. Prior to the invention of the '181 patent, routing the cables downward required cutting a hole in the sidewall of the overhead trough and manipulating the cables through a fitting placed in the hole, which weakened the troughs and consumed time and effort. Pl.'s '181 Br. at 2. The hole-cutting method required alteration to or replacement of the horizontal troughs in order to remove or reposition the exit routes, as a further disadvantage. Id.

ADC alleges the two versions of the Panduit Spillover Fitting, a curved plastic fitting that channels cable from a horizontal trough to equipment below, infringe claims 1 and 2 of the '181 patent. These claims read as follows:

> 1. A method of assembling a cable routing system comprising the steps of:
> providing a lateral trough section;
> mounting a cable exit trough to a top edge of the lateral trough section;
> routing a cable from the lateral trough section upwardly and transversely to the exit trough.
> 2. The method of claim 1, wherein the cable passes through the exit trough and passes in a downward direction relative to the lateral trough section as the cable exits the exit trough.

The '181 patent, claims 1, 2. Panduit has moved for summary judgment on this patent on two

grounds, asserting that the '181 patent is invalid in light of prior art and that the accused devices do not infringe as a matter of law. Panduit does not contest its Spillover Fitting is an exit trough, previously defined by this Court to be "a channel through which cable exits the lateral trough section." Markman Order at 6. Rather, it bases its argument of non-infringement on the construction of the terms "top edge" and "mounting to," asserting that the Spillover trough does not mount to the top edge of the lateral trough and therefore does not infringe the '181 patent.

**1. Invalidity**

Summary judgment of invalidity is warranted, Panduit argues, because the '181 patent is anticipated by three prior patents. Panduit alleges U.S. Patent No. 5,316,244 ("the Zetena patent"), U.S. Patent No. 4,163,572 ("the Benscoter patent"), and U.S. Patent No. 5,399,814 ("the Staber patent") each disclose every limitation of claims 1 and 2 of the '181 patent, and therefore anticipate and invalidate this ADC patent. Additionally, Panduit argues invalidity based on obviousness with respect to the Staber patent.

Each claim of a patent is presumed valid. 35 U.S.C. § 282 (2002). This presumption can be overcome with clear and convincing evidence of invalidity. Transclean Corp. v. Bridgewood Servs., Inc., 290 F.3d 1364, 1370 (Fed. Cir. 2002). A patent is invalid by reason of anticipation if a single prior art reference discloses every limitation of the claimed invention, such that the patent lacks novelty. Brown v. 3M, 265 F.3d 1349, 1351 (Fed. Cir. 2001). The single prior reference must "describe and enable . . . all claim limitations" sufficiently that the previous existence of the subject matter of the invention "was recognized by persons of ordinary skill in the field of the invention." Elan Pharm., Inc. v. Mayo Found. for Med. Educ. and Research, 304 F.3d 1221, 1227-28 (Fed. Cir. 2002). Anticipation is a question of fact. Id. at 1227.

**a. Zetena Patent**

Panduit asserts that the '181 patent is anticipated by the Zetena patent, issued May 31, 1994, which discloses a cable raceway for directing fiber optic cable. See The Zetena patent, p. 1 (Fiorella Decl. 1 Ex. 4). The Zetena specification describes and depicts a strain reliever and a clamp assembly as means to allow the cables to "enter and leave the raceway." Id. at col. 1:62. The strain reliever is a metal structure affixed to the top of the raceway sidewall in which cables are placed into slots and routed out of the lateral channel. Id. Figs. 7, 8. The clamp assembly is a latch that attaches to the top of the raceway wall and hinges and locks over the piece of cable. Id. Fig. 10. Panduit argues that these structures are cable exit troughs.

ADC admits that Zetena discloses a "cable routing system," including the "lateral trough section" of claim 1 of the '181 patent, but contends that Zetena does not anticipate the '181 patent because it fails to disclose a "cable exit trough." Panduit asserts that the strain reliever and the clamp assembly are exit troughs because they form channels through which the cables depart the horizontal trough. Panduit appears to rely as support for this argument on the report of its expert Eric R. Pearson[1] ("Pearson"), who opines that both the strain reliever and clamp assembly components are "identical, in function and location, to the method of mounting of an exit trough in the 181 patent." Pearson Report at 24 (Fiorella Decl. 1 Ex. 8). In contrast, ADC's experts state that these components of the Zetena patent are not cable exit troughs because they

[1] As an alternate ground in defense of invalidity, ADC maintains that Pearson has been stricken from Panduit's witness list and therefore cannot provide admissible testimony. At oral argument, however, Panduit submitted that the testimony of expert Beall adopts all of Pearson's findings and it anticipates that this evidence will be admissible. Because the admissibility of expert testimony is collateral to the issues at hand, ADC's argument in opposition to summary judgment on this particular ground will not be considered here.

lack the direction changing structure of the '181 patent, and therefore Zetena cannot anticipate claim 1. See Nixon Rebuttal Report at 23-24 (ADC Ex. 3); Erdman Rebuttal Report at 18 (ADC Ex. 7).

In the context of a head to head battle of expert opinion, summary judgment is inappropriate. The '181 patent is presumed valid, and, as a matter of law, Panduit has not defeated this presumption with clear and convincing evidence.

**b. The Benscoter Patent**

The Benscoter patent discloses a cable routing system whereby cables travel from main ducts, or lateral troughs, to branch ducts connected and perpendicular to the main ducts. The disagreement again focuses on whether or not Benscoter includes the "cable exit trough" element of the '181 patent. As with the Zetena reference, the parties each submit opposing expert opinions. A reasonable jury could accept the conclusion of ADC's experts that the lack of a transitional component in the Benscoter troughs negates disclosure of a "cable exit trough." This conclusion would refute Panduit's charge of invalidity by anticipation.

Moreover, as ADC notes, Benscoter does not route the cable in a downward direction *as* it exits the trough, a specification of claim 2 of the '181 patent. See The Benscoter patent, Figs. 1-5 (Fiorella Decl. 1 Ex. 6); The '181 Patent, claim 2. Panduit has not proven with clear and convincing evidence that Benscoter anticipates and therefore invalidates the '181 patent.

**c. The Staber Patent**

Panduit alleges Staber anticipates the '181 patent or, alternatively, renders it obvious. The Staber patent, titled "Cable Bend Control Device," is directed to routing cable over exposed vertical flanges. The Staber patent, Abstract (Fiorella Decl. 1 Ex. 9).

**i. Anticipation**

Panduit contends that the wall of the rack disclosed in the Staber patent, in conjunction with the vertical flanges running along the edges of the rack, form a trough, as found in claim 1 of the '181 patent. See Pearson Report at 10-11 (Fiorella Decl. 1 Ex. 8). It further argues that in directing the cable over the flange and onto the bridge, the Staber design routes the cable transversely, such that all elements of claim 1 are present in the Staber patent.

ADC articulates and supports with expert testimony the contention that Staber lacks both the lateral trough and the transverse routing elements of claim 1 as well as the downward movement of the cable recited in claim 2 of the '181 patent. See Nixon Rebuttal Report at 20 (ADC Ex. 3); Erdman Rebuttal Report at 16-17 (ADC Ex. 7). Thus, summary judgment of invalidity based on anticipation is unwarranted.

**ii. Obviousness**

Invalidity based on obviousness is a question of law determined by underlying questions of fact.[2] Beckson Marine, Inc. v. NMF, Inc., 292 F.3d 718, 725 (Fed. Cir. 2002) (citation omitted). "The underlying factual inquiries are: '(1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness.'" Id. at 725-26 (quoting In re

---

[2] Though the parties do not address these underlying factual inquiries directly, ADC offers evidence that the Staber patent is directed at routing cables over a vertical flange, that it does not suggest any motivation to transversely direct the cables, and that ADC's invention offered significant advantages over the prior art. Since Panduit has presented no evidence of motivation to combine prior references and no factual bases indicating obviousness, it has not shown by clear and convincing evidence that the Staber patent renders the '181 patent obvious. See Interconnect Planning Corp. v. Feil, 774 F.2d 1132, 1143-44 (Fed. Cir. 1985). Thus, these underlying inquiries are not analyzed further.

Dembiczak, 175 F.3d 994, 998 (Fed. Cir. 1999)). A patent is invalid if the claimed subject matter would have been obvious to a person of ordinary skill in the field. Id. at 725; 35 U.S.C. § 103(a). The defendant must prove obviousness by clear and convincing evidence. Beckson Marine, 292 F.3d at 725. To guard against assessment of obviousness with the benefit of hindsight, a defendant must show a motivation in the prior art to combine prior references in the manner of the patent. Id. at 727-28 (citations omitted). Thus, a finding of obviousness based on a combination of prior art references requires "some suggestion, motivation, or teaching in the prior art that would have led a person of ordinary skill in the art to select the references and combine them in a way that would produce the claimed invention." Karsten Mfg. Corp. v. Cleveland Golf Co., 242 F.3d 1376, 1385 (Fed. Cir. 2001).

Panduit forthrightly asserts, "the subject matter of [the '181 claims] would have been obvious to one of ordinary skill in the art in view of Staber." Def.'s '181 Mem. at 15. Because proof of invalidity due to obviousness demands some showing of teaching or motivation to modify the prior art, Panduit must also demonstrate motivation within the prior references. See Beckson Marine, 292 F.3d at 727-28. To sustain its burden at the summary judgment phase of establishing clear and convincing evidence of obviousness, Panduit must identify at least an implicit motivation to combine prior references. See id. at 728, 724. Panduit has not identified any teaching in the prior art of a combination that would result in the '181 patent. It therefore cannot succeed in proving this patent invalid by reason of obviousness. See Karsten, 242 F.3d at 1385. Accordingly, summary judgment based on obviousness is denied.

### 2. Non-Infringement

As a second ground for summary judgment, Panduit argues its products do not as a matter of law infringe claims 1 and 2 of the '181 patent, either literally or under the doctrine of equivalents. In patent litigation, summary judgment of non-infringement involves a two-step process in which the court first construes the patent claims, and second, applies the properly interpreted claims to the accused device to determine whether the scope of the claims covers the accused device. Pitney Bowes v. Hewlett Packard, 182 F.3d 1298, 1304 (Fed. Cir. 1999). Claim construction was completed in the Markman Order, and the issue at this stage is whether or not the relevant patent claims read on Panduit's accused products. This step is a question of fact. Id.

#### a. Literal Infringement

Literal infringement occurs when every claim limitation is present exactly in the accused product. Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995). ADC asserts literal infringement by two versions of Panduit's Spillover Fitting: the first, unmodified model, and the second, modified design, which differs only in that a small strip of plastic has been omitted from the bottom of the junction. The point of contention regarding the '181 patent is the limitation recited in claim 1 that the exit trough "mount[] to . . . a top edge." The '181 patent, claim 1. The Markman Order held that "'mounting . . . to' requires the exit trough to be affixed to and in contact with the top edge of the lateral trough section." Markman Order at 7. Top edge was construed to mean "a narrow, uppermost surface of the sidewall that is parallel to the floor of the trough." Id. at 6. Panduit's argument of non-infringement rests on its submission that its exit trough is not in contact with and affixed to the top edge of the lateral trough and does not include an equivalent of this element. Because ADC has accused two versions of the Panduit

fitting, advancing arguments of both literal infringement and infringement by equivalents, the original and modified products will be addressed separately under the applicable theories of infringement.

**i. Original, Unmodified Version**

The original Spillover Fitting has a straight-line underside without the small notch segment removed, such that there is no gap between the top of the lateral trough and the bottom of the exit trough when it is mounted into place. Nicoli Dep. of 11/8/01 at 135 (ADC Ex. 27). ADC's experts opine that this product is affixed to and in contact with the top of the trough and therefore literally infringes the '181 patent. See ADC Exs. 1 ¶ 8, 4 ¶ 6. In addition to its expert testimony, ADC cites evidence from Panduit employees and documents in which Panduit describes its original Spillover Fitting as "mount[ing] to the top of the fiber duct" and conceding that the fitting rested directly on the apex of the trough wall. Statement of Robert McCann (ADC Ex. 30); Nicoli Dep. of 10/11/01 at 39 (ADC Ex. 22). Such evidence suffices to maintain a genuine dispute of fact as to literal infringement of the '181 patent by the original, unmodified Panduit Spillover Fitting. Summary judgment on this ground is denied.

**ii. Current, Modified Version**

Panduit's modified Spillover product is identical to its original product, with the exception of a small area of plastic that has been removed from the bottom of the wall that passes over the top of the lateral trough. It is uncontested and readily apparent that this version does not touch the uppermost point of the lateral trough when properly positioned on the cable pathway. Panduit submits that literal infringement is impossible, as the product, with the space created by the removed notch, cannot be "affixed to and in contact with the top edge of the lateral trough

section," as the claim was construed in the Markman Order. Markman Order at 7. Nonetheless, ADC alleges literal infringement by the modified version as well, under the theory that the "top edge" of Panduit's lateral trough is not the curved apex, but rather the horizontal ledge below, to which Panduit's bracket is attached.

ADC's argument is premised on its experts' opinions that under the Court's claim construction the top edge of the lateral trough must be a planar surface, since the hook apex is merely a "zero-area mathematical line." Pl.'s '181 Br. at 19. However, the Markman Order does not specify the type of surface of the top edge. ADC's interpretation is not supported by the claim construction and disregards the requirement that the top edge be "a narrow, *uppermost* surface of the sidewall that is parallel to the floor of the trough." Markman Order at 6 (emphasis added). The groove beneath the uppermost surface of the sidewall is not a "top" edge, and, accordingly, the current version of Panduit's Spillover Fitting, which is not in contact with the top edge of the lateral trough, does not literally infringe the '181 patent as a matter of law. Summary judgment of literal non-infringement by the modified accused device is granted.

Alternatively, anticipating the Court's conclusion regarding the interpretation of "top edge," ADC submits that Panduit's device, which is mounted just below this point, infringes the '181 patent under the doctrine of equivalents.

**b. Doctrine of Equivalents**

To establish infringement by equivalents, a plaintiff must prove that every claim element has an equivalent counterpart in the accused device. Hilton Davis v. Warner-Jenkinson, 520 U.S. 17, 21, 40 (1997). A feature of an accused product is equivalent to a claim element if nothing more than insubstantial differences distinguish the two. Leggett & Platt Inc. v. Hickory Springs

Mfg. Co., 285 F.3d 1353, 1359 (Fed. Cir. 2002) (internal citation omitted). A claim element and an accused component may be equivalent if they function in substantially the same way to achieve substantially the same result, though this "function-way-result analysis" is not necessarily determinative of equivalence. See id.; Kemco Sales, Inc. v. Control Papers Co., 208 F.3d 1352, 1364 n.6 (Fed. Cir. 2000). The fundamental inquiry in determining equivalence is whether the differences between the accused device and the patent claims are substantial or insubstantial. Kemco, 208 F.3d at 1364 n.6. ADC argues the manner and location of the mounting of the Spillover Fitting are equivalent to the "mounted to the top edge" limitation of claim 1 of the '181 patent.

Panduit counters that ADC is attempting to assert a scope of equivalents that would encompass the prior art. A patentee may not seek to give its claim limitations a range of equivalents so broad as to ensnare prior art. Marquip, Inc. v. Fosber Am. Inc., 198 F.3d 1363, 1367 (Fed. Cir. 1999) (citing Wilson Sporting Goods Co. v. David Geoffrey & Assoc., 904 F.2d 677, 684 (Fed. Cir. 1990)). The patent holder "should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO [Patent and Trademark Office] by literal claims." Wilson, 904 F.2d at 684. Whether or not an asserted equivalent is found in the prior art is a question of law, which the court may determine by creating a hypothetical claim that literally covers the accused device. Id. at 683, 684. Whether or not the hypothetical claim would have been permissible in view of the prior art is then evaluated. Id. at 684. If the claim would have been be permissible, there is no bar to the asserted range of equivalents; if not, the patentee is precluded from claiming the particular scope of equivalents. Id. The burden is on ADC, as patentee, to establish the equivalent does not encompass the prior

art. Id. at 685.

The hypothetical claim posed by Panduit simply reads out the "top edge" limitation of claim 1 and therefore is unnecessarily broad. The equivalent asserted by ADC is narrower than simply mounting the exit trough to the lateral trough; it involves mounting the exit trough to the sidewall of the lateral trough in such a way that the cables are routed upwardly and transversely *over the top edge* of the lateral trough. To prove a hypothetical claim literally encompassing Panduit's device would have been allowed over the prior art, ADC suggests an expansion of claim 1 in which "mounting a cable exit trough to a top edge of the lateral trough section" is modified to "mounting the cable exit trough to the lateral trough 'capturing the top edge,'" routing the cables "upwardly and transversely over the top edge." Pl.'s '181 Br. at 32; see also Jurgens v. McKasy, 927 F.2d 1552, 1561 (Fed. Cir. 1991) (employing a hypothetical claim "similar to the asserted claim but broad enough to literally cover the accused product[]"). Such a claim would cover Panduit's accused product, and ADC has an expert opinion to the effect that this method is insubstantially different from, and thus equivalent to, the mounting to the top edge element recited in claim 1 of the '181 patent. See Nixon Decl. ¶ 9 (ADC Ex. 1); Erdman Decl. ¶ 7 (ADC Ex. 4). This hypothetical limitation does not read literally on the prior art cited by Panduit, as the Warren & Brown[3] reference involves routing the cable through a hole or removed section of the lateral trough wall into which an exit spout has been inserted, and does not capture

[3] Panduit asserts the three aforementioned patents, Zetena, Benscoter, and Staber, and another routing method, the Warren & Brown system, would be ensnared by a hypothetical claim broad enough to cover the accused Spillover Fitting. Def.'s '181 Mem. at 19-20. Because ADC has produced sufficient evidence to refute summary judgment of invalidity with respect to Zetena, Benscoter, and Staber, by distinguishing the '181 patent's inclusion of an "exit trough," only Warren & Brown is discussed here.

the top edge so as to direct the cable over the top of the side wall of the lateral trough. See Warren & Brown & Staff "lightpaths" catalog pp. 7-8 (ADC Ex. 33); Warren & Brown Brochure pp. 1-2 (ADC Ex. 34). Therefore, consistent with Wilson, the prior art does not bar ADC's argument of equivalence. See Wilson, 904 F.2d at 684.

There is evidence to support ADC's proposition that the mounting of Panduit's Spillover Fitting is equivalent to the "mounting . . . to the top edge" limitation of the '181 patent. See ADC Exs. 1 ¶ 9, 4 ¶ 7, 5 at 5, 6 at 1-2. Contrary to Panduit's assertion that ADC's theory of equivalents would violate the all-limitations rule, a finding of insubstantial difference between an exit trough that mounts to the top edge of the lateral trough and one that mounts to a groove in the sidewall just beneath the top edge, similarly covering and coming over the top edge, would not vitiate this element. Cf. Ethicon-Endo Surgery v. United States Surgical Corp., 149 F.3d 1309, 1321, 1318-19 (reversing district court's judgment of non-infringement by equivalents where only a small physical difference distinguished the allegedly analogous feature of the accused device from that of the claimed invention and affirming summary judgment as to a claim where the accused location was "not even close" to the location specified in the claim).

Panduit's photos and description of its product reveal the existence of a slight space between the bottom of the accused device and the top edge of the sidewall, such that the fitting is not in contact with this surface, but passes just over it. Def.'s '181 Mem. at 16-17. ADC's expert evidence contends that Panduit's alternative method of mounting and the resultant gap, measuring a fraction of an inch, make no difference in the function of the trough, and that Panduit's Fitting performs the same function as the '181 patent in the same way, to achieve the same result. See ADC Exs. 1 ¶ 9, 4 ¶ 7, 5 at 5-6. Panduit's capturing the uppermost edge of the

lateral trough, the expert testimony concludes, is not substantially different from contacting and affixing to this top edge. See ADC Exs. 4 ¶ 7, 6 at 2. This offer of proof of substantial similarity in the steps of mounting the respective exit troughs establishes that an equivalency argument does not eviscerate the "mounting the exit trough . . . to the top edge" element, and displays sufficient evidence of factual dispute to withstand summary judgment.

In sum, Panduit has not shown by clear and convincing evidence that the '181 patent is invalid by reason of anticipation or obviousness; summary judgment of invalidity is denied Likewise, it has not eliminated all dispute of material fact with respect to literal infringement by the original, unmodified Spillover Fitting, which will remain an issue for trial. It has, however, established that the current, modified product cannot literally infringe the '181 patent as a matter of law, and therefore summary judgment of literal non-infringement by the modified version is granted, while summary judgment of infringement under the doctrine of equivalents is denied.

**C. NON-INFRINGEMENT OF THE '243 PATENT**

In the cable routing industry, "couplings" or "couplers" are mechanisms used to join the lateral troughs carrying the cables. The '243 patent represents one of ADC's coupling inventions, intended to improve the ease of fitting together the troughs by providing a means to connect the troughs without drilling or the use of bolts or rivets. The '243 coupling functions by using internal springs to clamp the trough sections into place.

Prior to this invention, the connection process involved drilling holes in the troughs and securing the couplings in place with nuts and bolts, a more time-consuming and difficult method. Panduit's literature regarding its couplings reveals that its previous product required such installation. See ADC Exs. 9, 10 at 1, 11 at 4, 60 at 1. ADC contends that Panduit studied and

copied ADC's new routing design, thereby infringing the '243 patent. Pl.'s '243 Br. at 3. Citing internal Panduit memoranda, ADC asserts that Panduit created its Qwiklock Couplers,[4] the accused devices, "us[ing] ADC as benchmark," essentially appropriating ADC's invention and making only slight changes to its product. Pl.'s '243 Br. at 3 (citing Ex. 56 at 2).

ADC alleges Panduit infringed claims 1 and 2 of the '243 patent. The Markman Order determined that these claims are written in "means plus function" language, such that 35 U.S.C. § 112 ¶ 6 applies. The parties' dispute revolves around certain elements of the alignment means and clamp means of claim 1, and of the grip means of dependent claim 2. The Markman Order established that the "alignment means" requires

> a continuous outer wall and a continuous inner wall defining an enclosed pocket sized to receive the wall of the cable-pathway defining element. The continuous inner and outer walls must be spaced from each other by a distance approximating the thickness of the wall of a cable pathway defining element. The spacing between the inner and outer walls defines a continuous U-shaped enclosed pocket between the first and second inner and outer walls to receive the side walls and bottom wall of the elements.

Markman Order at 10. With respect to the clamp means, the Court determined that this element "includes resiliently biased leaf springs . . . entirely enclosed within the pockets and, therefore, . . . entirely between the inner and outer walls of the alignment means." Id. at 12. Finally, "[t]he proper construction of 'resiliently biased spring' is a spring that is under stress even before the trough wall is inserted into the coupler." Id. at 13.

Panduit argues that its Qwiklock Coupler does not include any of these limitations and therefore cannot infringe the '243 patent as a matter of law. ADC counters that expert evidence

---

[4] There are two versions of the accused product: the original Qwiklock Coupler, which includes a plastic cover on the back of the metal barb that holds the trough walls in place, and the recent model, without such a cover, which adds flanges to the barb. Def.'s '243 Mem. at 2.

establishes that an identical counterpart or an equivalent of each of these limitations is found in the Panduit product, which could lead a jury to a finding of infringement.

To prove literal infringement under § 112 ¶ 6,[5] the plaintiff must establish that the accused device performs the same function as the claimed invention, with a structure identical or equivalent to "the corresponding structure in the specification." Wenger Mfg., Inc. v. Coating Machinery Sys., Inc., 239 F.3d 1225, 1238 (Fed. Cir. 2001). Two structures are equivalent if their differences are insubstantial. Kemco, 208 F.3d at 1364. The specification structure and the accused counterpart "may be 'equivalent' for purposes 35 U.S.C. [§] 112, [¶] 6 if they perform the identical function, in substantially the same way, with substantially the same result." Id. Equivalency is a question of fact. Wenger, 239 F.3d at 1231.

Panduit asserts that its product does not infringe the '243 patent because the Qwiklock Coupler lacks several elements recited in claim 1, as construed by the Court. With respect to the alignment means, Panduit submits that its device lacks both a continuous outer wall and an enclosed pocket. Regarding the clamp means, Panduit contends that there can be no infringement of the '243 patent because its coupling does not include a resiliently biased spring carried within an enclosed pocket.

---

[5] It is not necessary to consider infringement under the doctrine of equivalents, as its only role in § 112 ¶ 6 means-plus-function claims is to expand the scope of equivalents to accused devices that perform "the same or equivalent" function. See Kemco, 208 F.3d at 1364. Under § 112 ¶ 6, literal infringement occurs when the accused product performs the *identical* function as that recited in the claim, with the same or equivalent structure as that disclosed in the specification. Wenger, 239 F.3d at 1238. Under the doctrine of equivalents, an accused device infringes a patent when it performs the *same or substantially similar* function with equivalent structures. Kemco, 208 F.3d at 1364. Because ADC has presented evidence sufficient to raise a factual question as to whether Panduit's product performs the identical recited functions, as required for literal infringement under § 112 ¶ 6, this Order will not address the broader doctrine of equivalents with respect to the '243 patent.

**1. Alignment Means**

As stated above, the alignment means of claim 1 is to be construed "as requiring a continuous outer wall and a continuous inner wall defining . . . a continuous U-shaped enclosed pocket." Markman Order at 10. Panduit does not contest that its device performs the identical function to that recited in claim 1; aligning the ends of the troughs that comprise the cable pathway. Accordingly, the first requirement of the test for literal infringement under § 112 ¶ 6 is met and it remains only to determine whether Panduit's structure is the same as or equivalent to that of the '243 specification. See 35 U.S.C. § 112 ¶ 6; Wenger, 239 F.3d at 1238.

It is undisputed that Panduit's Qwiklock Coupler does not have a continuous outer wall. The parties do, however, disagree as to whether Panduit's coupling includes an enclosed pocket. Thus, the issues are whether Panduit's discontinuous exterior is an equivalent structure to ADC's continuous wall and whether the Panduit product literally contains an enclosed pocket. See 35 U.S.C § 112 ¶ 6; Wenger, 239 F.3d at 1238.

**a. Continuous Outer Wall**

In opposition to Panduit's Motion, ADC relies on the reports and resultant opinions of patent experts Dr. Larry S. Nixon ("Nixon") and Dr. Arthur G. Erdman ("Erdman"), stating that Panduit's discontinuous sections are equivalent to ADC's continuous outer wall. Nixon Report at 18-19 (ADC Ex. 2); Erdman Report at 10 (ADC Ex. 5). Specifically, Nixon opines that the difference between the two structures is "insubstantial and . . . has no effect on the alignment function," stating that, "[i]n common experience a 'wall' can be formed from a continuous section or it may be formed from spaced wall members, either way it constitutes a "wall." Nixon Report at 18-19 (ADC Ex. 2). Erdman also concludes "[t]he difference between a continuous

outer wall and an outer wall formed of discontinuous outer wall elements is insubstantial." Erdman Report at 10 (ADC Ex. 5). Additionally, ADC argues the Examiner for the Patent and Trademark Office ("PTO") referred to two discontinuous pieces of a prior patent as "wall means," implying, ADC contends, that separate wall members are equivalent to a one-piece wall. See Office Action of 6/23/92 at 2-3 (ADC Ex. 39).

Panduit asserts that prosecution history estoppel[6] precludes ADC from arguing equivalency, because, after rejection of its application, ADC amended its claim, to distinguish its invention from prior art. ADC responds that its amendments did not mention the physical configuration of the outer walls, and that its prosecution history makes no reference to "continuous" or "discontinuous" outer walls.

Prosecution history estoppel bars "the application of the doctrine [of] equivalents as to" any elements of a claim to which it applies. Warner-Jenkinson Co., et al. v. Hilton Davis Chem. Co., 520 U.S. at 33. In Warner-Jenkinson, the Supreme Court articulated the preclusive bounds of prosecution history estoppel, stating that when a patentee amends the patent application to overcome prior art, a presumption of prosecution history estoppel arises. Id. Unless the patent-holder can establish a reason for amendment sufficient to overcome this presumption, prosecution history will apply. Id.

The Court further clarified the application of prosecution history estoppel in Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 122 S. Ct. 1831 (2002), holding that estoppel is not a complete bar to claiming infringement by equivalents, but that the patentee must "show[] that

---

[6] The same prosecution history estoppel that applies to the judicially-created doctrine of equivalents also applies to an equivalents analysis under § 112 ¶ 6. Ballard Med. Prods. v. Allegiance Healthcare Corp., 268 F.3d 1352, 1363 (Fed. Cir. 2001).

the amendment in question does not surrender the particular equivalent in question." Id. at 1842. "The relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." Wenger, 239 F.3d at 1239 (quoting Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1457 (Fed. Cir. 1998)).

After the Examiner twice rejected ADC's application, ADC submitted a third amendment to claim 1, commenting that a previous patent did "not include inner and outer walls defining pockets, with the spring received within the pocket," and further explaining how its claim differed from the prior art. Proposed Amendment of 7/6/92 at 4 (Fiorella Decl. 2 Ex. 15) (emphasis in original). Panduit contends that this amendment, specifically directed at narrowing ADC's claim so as to secure acceptance by the Examiner, prohibits ADC from claiming any equivalents to this subject matter. Though the reason for ADC's amendments to claim 1 was to narrow the scope of the claim so as to distinguish it from prior art, and thus the presumption of prosecution history estoppel is triggered with respect to those additions to the claim, it did not thereby surrender coverage of a discontinuous outer wall. Festo clarifies that not *every* distinguishing amendment to a claim defeats *every* assertion of equivalency, but rather that the reach of the estoppel "requires an examination of the subject matter surrendered by the narrowing amendment." Festo, 122 S. Ct. at 1840.

ADC has produced evidence of the prosecution history and of the prior art it sought to distinguish to establish that it did not disclaim a discontinuous outer wall. Prosecution history estoppel does not bar ADC from asserting that Panduit's discontinuous structure is equivalent to the outer wall disclosed in the '243 patent. Panduit is unable to identify anywhere in the prosecution history that ADC describes its outer wall as "continuous," and ADC's argument for

overcoming the prior art is not based on continuity of its outer wall. See Proposed Amendment of 7/6/92 at 4-5 (Fiorella Decl. 2 Ex. 15). ADC described only its inner wall as continuous, and distinguished its invention based on the particulars of the spring, not on whether the exterior wall was discontinuous. Id. at 4; cf. Wenger, 239 F.3d at 1239 (stating "the applicant distinguished the [prior] patent based on its lack of a housing, not on its inability to recirculate air"). The prior art referenced by the Examiner and ADC, a clamp for a windshield wiper blade, included a partially exposed spring, while the ADC claim placed the spring "completely within the pocket" between the interior and exterior walls of the coupling. See Proposed Amendment of 7/6/92 at 4.

Thus, ADC has shown that during the prosecution process it did not surrender the equivalent of a discontinuous outer wall. It does, however, remain "bound by its own previous explanation[]" that the spring means is enclosed in the pocket created by the inner and outer walls, the focus of its final amendment to claim 1. Markman Order at 12; Amendment of 10/18/93 at 4 (Fiorella Decl. 2 Ex. 15).

**b. Enclosed Pocket**

Panduit next argues that ADC cannot establish infringement because the Qwiklock Coupler does not literally have a "continuous U-shaped enclosed pocket between the . . . inner and outer walls to receive" the walls of the cable troughs, and that ADC is estopped from claiming any equivalents. Markman Order at 10. Panduit contends that its Coupler cannot literally infringe the '243 patent, due to its lack of any pocket. In response, ADC again proffers Nixon and Erdman's expert opinions to prove that both devices have "a double wall arrangement (inner wall spaced from outer wall) that defines pockets into which sidewalls of trough members are inserted." Nixon Report at 18 (ADC Ex. 2); accord Erdman Report at 9 (ADC Ex. 5).

With respect to prosecution history estoppel, Panduit correctly avers that ADC's narrowing amendments emphasizing "enclosed pockets" and distinguishing its claim with this feature, preclude ADC from arguing equivalence of structures that do not include enclosed pockets. Amendment of 10/18/93 at 4 (emphasis in original); see Festo, 122 S. Ct. at 1840-41. Estoppel by prosecution history is irrelevant, however, because ADC does not argue equivalency, but rather literal presence of this element.

In support of its argument, ADC cites prosecution history evidence, based on the Examiner's rejection and subsequent acceptance of claim 1, that the meaning of enclosed pocket is "a pocket that covers and shields the spring," and therefore that Panduit's product includes this identical structure. Amendment of 10/18/93 at 4 (Fiorella Decl. 2 Ex. 15). ADC argues it focused on enclosed pockets in the patent application process in response to the Examiner's finding that the cited Baut reference, which did not shield the spring from the interior, disclosed a spring carried within a pocket. Id. ADC thereafter distinguished its claim on the ground that it possessed "enclosed pockets, with the spring received within the pocket and shielded from the interior," while the cited prior reference revealed a spring "completely exposed to the interior." Id. (emphasis in original). The Examiner then allowed the claim, showing, contends ADC, that the proper meaning of "enclosed pocket" is a pocket formed between inner and outer wall members sized to cover and shield the spring from the interior of the pathway.

Panduit contends the Qwiklock Coupler contains no enclosed pocket, because its barb,[7] the mechanism that holds the trough walls in place, is not shielded by a wall, but has an

---

[7] The barb is the component ADC claims is the equivalent of the '243 spring means structure.

uncovered, exposed back. It submits that the back of its barb is not a part of any wall, and therefore cannot be considered to cover and enclose the alleged spring, the pieces of the barb that grip to the trough walls.

ADC attempts to conceptually divide the Panduit barb into multiple elements, referring to the back of the barb as a "spring backing" and the slanted portions descending from the back as the springs. The barb is in fact comprised of one piece of metal with no separate "backing." This, however, is not conclusive on ADC's claim that the Qwiklock Coupler includes enclosed pockets. ADC has presented two experts' opinions that the back of Panduit's barb is part of an outer wall structure, and therefore that the Coupler literally contains enclosed pockets, formed between the inner wall and the back (outer-facing portion) of the barb. See Nixon Report at 18-19, attach. 2B (ADC Exs. 2, 2B); Erdman Decl. ¶ 14 (ADC Ex. 4). Evidence that Panduit's Coupler literally embodies a double wall design that covers the spring means, raises a genuine issue of fact as to whether the Panduit structure includes "enclosed pockets." ADC has come forth with credible evidence that Panduit's Coupler has a dual wall structure defining pockets, that such pockets may be viewed as enclosed, and that the continuity of the pockets and defining walls is insignificant. Under this circumstance, with respect to the alignment means, non-infringement is not established as a matter of law.

**2. Clamp Means**

Panduit next seeks summary judgment of non-infringement because, it argues, its product does not include two of the limitations of ADC's clamp means. "The clamp means element includes resiliently biased spring means in the form of resiliently biased leaf springs disposed in the first and second pockets. The spring means must be entirely enclosed within the pockets and,

therefore, must be entirely between the inner and outer walls of the alignment means." Markman Order at 12. Panduit argues that its product does not include a resiliently biased spring, and that its spring is not within enclosed pockets.

**a. Resiliently Biased Spring**

As stated in the Markman Order, the resiliently biased spring "is under stress even before the trough wall is inserted into the coupler." Id. at 13. ADC admits that Panduit's barb is not stressed before the trough walls are inserted. The issue is whether or not Panduit's non-stressed spring is equivalent to ADC's pre-stressed spring. See 35 U.S.C. § 112 ¶ 6.

Panduit argues that the "all-limitations" rule prohibits ADC from asserting that Panduit's barb device, concededly not pre-stressed, is the equivalent of the structure in the '243 specification corresponding to the spring means, a pre-stressed spring. Additionally, Panduit contends that its barb coupling cannot be equivalent to ADC's spring coupling because it functions in a substantially different way.

**i. All-Limitations Rule**

In addition to prosecution history estoppel, infringement under the doctrine of equivalents may be precluded by the "all-limitations rule." According to the all-limitations rule, each element, or limitation in a claim is deemed material, and the doctrine of equivalents is to be applied to each separate element, rather than to the invention as a whole. Warner-Jenkinson, 520 U.S. at 29. Further, the concept of equivalence must not be applied so broadly "as to effectively eliminate [an] element in its entirety." Id. Citing the Federal Circuit's decision in Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc., 291 F.3d 1317 (Fed. Cir. 2002), Panduit claims that construing its barb as an equivalent structure to the 243's resiliently biased spring would

"vitiate that limitation and thereby run afoul of the all-limitations rule." Cooper, 291 F.3d at 1322.

In Cooper, a claim limitation providing for the workover port of a wellhead device "between . . . two plugs," was found to have excluded a finding of equivalency for a port located "above" the two plugs. Id. To allow the plaintiff to claim the accused product was equivalent would render meaningless the material element of the particular location of the port. Id. As a further example of the application of the all-limitations rule, the court cited its previous decision in Moore U.S.A., Inc. v. Standard Register Co., 229 F.3d 1091, 1094 (Fed. Cir. 2000), in which it held that an accused mailing device whose adhesive extended to 47.8 % of the length of the margin could not be equivalent to the patent claim, requiring the adhesive extend to "the majority" of the length of the margin, as a matter of law. Id. at 1321-22 (citing Moore, 229 F.3d at 1094).

ADC's theory of equivalence does not vitiate the spring means element of the '243 patent. Applying the all-limitations rule rigidly would adhere to a rule of strict literalism the doctrine of equivalents was designed to prevent. Cf. Festo, 122 S. Ct. at 1841; see also Graver Tank & Mfg. Co. v. Linde Air Prod. Co., 339 U.S. 605, 607-08 (1950) (expressing the need for the doctrine of equivalents to protect against fraud on the patent). By definition, an accused product infringing by equivalents does not literally include at least one element of the claimed invention. See Warner-Jenkinson, 520 U.S. at 21; Graver Tank, 339 U.S. at 607, 608. To rule broadly that a feature of an accused product altered to avoid literal infringement may not be an equivalent to an element of the claimed invention without eliminating that claim element, would vitiate the doctrine of equivalents itself.

Allowing a jury to decide whether a coupling that is not initially under stress is insubstantially different from a coupling that is pre-stressed, would not eviscerate the spring means limitation of the '243 claim. Both couplings include a spring mechanism and ADC has proffered expert opinion that the two structures are equivalent. See Erdman Report at 11-12 (ADC Ex. 5); Nixon Report at 19-20 (ADC Ex. 2); cf. Wright Med. Tech., Inc. v. Osteonics Corp., 122 F.3d 1440, 1445 (Fed. Cir. 1997) (finding that the plaintiff's "theory of equivalence would not 'entirely vitiate a particular claim element'").[8] ADC has presented evidence from experts that the Panduit barb performs the recited function of the ADC leaf spring, which is "to urge [a trough] wall against a wall of [the] coupling," thereby connecting and holding the trough walls in place. Markman Order at 12; see Nixon Report at 19-20, attach. 2B at 5 (ADC Exs. 2, 2B); Erdman Report at 11, attach. 5D at 3-5 (ADC Exs. 5, 5D). Furthermore, the evidence offered by ADC that the structural feature in dispute, the pre-stressed state of the spring, is not necessary for the function of spring means, supports the theory of equivalence. Erdman Decl. ¶ 16 (ADC Ex. 4); Nixon Decl. ¶ 19 (ADC Ex. 1); see also Wright Med., 122 F.3d at 1445 (stating that the fact-finder might consider testimony that the disputed characteristics of a claim

---

[8] In Wright Medical, the Federal Circuit reversed a grant of summary judgment of non-infringement by equivalence, finding that the plaintiff must have an opportunity to prove that the claimed rod, which was construed by the District Court to "require a tight or snug fit" and "extend through" the isthmus, was infringed by the accused rod, which concededly "did not fit tightly against or extend through the isthmus." Id. at 1444, 1445 (emphasis added). The court expressly rejected the district court's conclusion that a finding of equivalence would entirely eliminate the particular element from the claim. Id. at 1445. The plaintiff had a right to advance a theory of equivalence to prohibit the defendant "from making and selling a device that combines 'elements identical or equivalent to each claimed element of the patented invention.'" Id. (citing Warner-Jenkinson, 117 S. Ct. at 1054). The court further noted that testimony introduced by the plaintiff established that the limitations at issue, the tight fit and extension through the isthmus, were not required "to achieve at least some of the functionality of the claimed rod." Id. at 1445.

element were not required to achieve at least some of the recited functionality, to "support[] a finding of infringement under the doctrine of equivalents").

Unlike the Cooper and Moore fact patterns, here the contested element, the structure corresponding to the spring means, would not be read out of the claim entirely by allowing equivalents. Rather, the patentee, ADC, has produced evidence that the "resiliently biased spring" element may be met by various equivalent mechanisms, whether pre-stressed or not pre-stressed. See Erdman Report at 11-12 (ADC Ex. 5); Nixon Report at 19-20 (ADC Ex. 2). ADC is not, therefore, "recharacterizing its claim so as to ignore a material limitation." Cooper, 291 F.3d at 1322. ADC's evidence that the two clamp structures function in substantially the same way to reach substantially the same result, further militates against precluding its theory of equivalents by application of the all-limitations rule. See Ethicon-Endo, 149 F.3d at 1321.

The literal scope of the claims excludes the accused device from being considered an identical structure. The springs of Panduit's Qwiklock Coupler are not under stress before the trough walls are inserted, and therefore there is no complete literal commonality between this device and that in the '243 specification. However, because "both the claimed invention and the [Panduit] device employ" a spring means, and ADC has presented evidence of substantial similarity, allowing ADC to pursue a theory of infringement by equivalents would not vitiate this claim element. Wright Med., 122 F.3d at 1445-46 (referring to the accused and patented medical rods). Despite the difference in the pre-installation tension of the devices, a reasonable jury could find that Panduit's non-stressed barb is an equivalent structure to ADC's resiliently biased spring. This conclusion is buttressed by ADC's evidence that it is mechanically irrelevant to the function of the spring means whether or not the spring mechanism is pre-stressed. Cf. id. at

1445; Erdman Decl. ¶ 16 (ADC Ex. 4); Nixon Decl. ¶ 19 (ADC Ex. 1).

**ii. Function-Way-Result**

Panduit further contends no reasonable jury could find its barb feature equivalent to ADC's spring means, in light of the different way the two mechanisms function, and the different results obtained. Panduit proffers its expert rebuttal reports to prove that, when engaged, Panduit's barb permits the inserted trough wall to be pulled out of the coupling only with great force, while ADC's leaf spring allows disengagement with little separation force. See Beall Rebuttal Report at 9 (Fiorella Decl. 2 Ex. 8); Stoll Report attach. 2 (Fiorella Decl. 2 Ex. 9). This results, Panduit argues, in a stronger coupling force in its device.

ADC responds that both Nixon and Erdman find the two structures to be equivalent. Further, it alleges that, in contravention of Federal Circuit law, Panduit is improperly comparing the accused products to an ADC commercial embodiment, instead of to the '243 claims, and importing limitations not contained in the claims.

With respect to the function of the Panduit barb, the recited function of the spring means element does not address the amount of force required for coupling or separation. See The '243 patent. "The language 'directed to urge an element wall against a wall of said coupling upon insertion of said element wall between said outer and inner walls' recites the function of the spring means." Markman Order at 12. Panduit offers no evidence that its device does not thus perform, but relies on a distinction, regarding the amount of force exerted by its barb, not contained in the '243 claim or specification. See The '243 patent. "[A] court may not import functional limitations that are not recited in the claim," and differences in the urging and gripping forces will not be considered. Wenger, 239 F.3d at 1233. The proffered expert opinion that the

Panduit barb performs the identical function as the '243 leaf spring establishes a factual dispute on the first prong of literal infringement under § 112 ¶ 6. Erdman Decl. ¶¶ 15-16 (ADC Ex. 4); Nixon Decl. ¶¶ 17-19 (ADC Ex. 1); see Wenger, 239 F.3d at 1238.

Regarding the second prong of literal infringement, structural equivalence, ADC's presentation of expert opinion that the accused structures and those of the '243 patent are equivalent also renders this an issue best reserved for jury consideration. Panduit asserts the devices are substantially different due to the way they function and the results obtained. ADC contends that any differences are insubstantial, and therefore that the Panduit Coupler contains an equivalent structure to ADC's resiliently biased spring. This is a classic dispute of material fact which precludes summary judgment on this issue.

**b. Spring Within an Enclosed Pocket**

Summary judgment is proper, Panduit contends, because the accused product does not include a spring entirely within an enclosed pocket, as required by claim 1. This assertion tracks Panduit's argument with respect to the alignment means, discussed above, that the Qwiklock Coupler does not contain an enclosed pocket. As noted above, resolution of this question, whether or not the accused device contains a spring within an enclosed pocket, depends on whether or not Panduit's coupling can be said to literally include the enclosed pocket structure. See supra sec. III(C)(1)(b). ADC has presented expert evidence answering in the affirmative and Panduit has not shown why the Court should disregard that evidence. The debate essentially turns on whether or not Panduit's barb and barb cover constitute part of an outer wall, with the spring carried "entirely between the inner and outer walls of the alignment means." Markman Order at 12. Again, infringement is a question of fact, on which ADC has produced sufficient

evidence to withstand summary judgment.

### 3. Grip Means

Panduit's argument of non-infringement of claim 2, reciting a grip means, is that its coupling does not have "cutout tabs" in the body of its barb, but rather "pointed extensions." These pointed extensions are argued not to be equivalent to the '243 "grip means" structure, the "'cutout tabs' in the body of the leaf springs," because they function in a substantially different way to obtain a substantially different result. Markman Order at 14. The pointed extensions, Panduit argues, are held in contact with the trough wall in a different way than are the grip means of the '243 spring, resulting in a stronger coupling.

ADC counters that both Panduit's own engineering documents and ADC's expert submissions establish that the Panduit barb performs the recited function with an identical or, at a minimum, an equivalent structure. See ADC Exs. 1 ¶ 21, 4 ¶ 17, 57. This raises a genuine question of material fact regarding literal infringement of claim 2 under § 112 ¶ 6.

In sum, the construction of ADC's §112 ¶ 6 claims of the '243 patent establishes that the Panduit's Qwiklock Coupler lacks several of the literal limitations of claim 1. However, ADC's theory of literal infringement under § 112 ¶ 6, by identical function and equivalent structures, remains viable. Expert evidence and the prosecution history of the '243 patent create fact issues as to whether the accused device contains an identical or equivalent match to each disputed structure. Summary judgment of non-infringement of the '243 patent must be denied.

## D. NON-INFRINGEMENT OF THE '781 PATENT

Lastly, Panduit moves for summary judgment of non-infringement of the '781 patent, directed at improving coupling of fiber optic cable channels. This patent, like the '243, discloses

a coupling for joining fiber optic cable channels (troughs) to create an interconnected cable pathway. Pl.'s '781 Br. at 2. The patent is designed to improve the connection process, making the coupling simpler to install and remove by including all the attachment pieces on the body of the coupling to eliminate the need for separate components. Id. The preferred embodiment reveals a U-shaped fitting with inner and outer walls into which the ends of the lateral troughs are inserted. Id. at 3; The '781 patent, Figs. 1, 3. Screw fasteners secure the position of the lateral troughs, once inserted. The '781 patent, col. 4:13-15, 48-52.

ADC avers that Panduit's Bolt-On Coupler and Drop-In Coupler, part of Panduit's cable-routing FiberRunner product line, infringe claims 1 and 2 of this patent. Panduit's previous coupling product did not have a built-in fastener system. ADC alleges Panduit copied its '781 patent when creating the accused couplings, making only insubstantial changes. Only two elements of claim 1 are at issue; Panduit does not contest that all other claim features are present it its couplings. In dispute are "a fastener system positioned on said wall guide" and "an axially driveable fastener." Id., claim 1.

In relevant part, claim 1 provides:

> a fastener system positioned on said wall guide and including a bracket disposed to oppose said external surface when said terminal end is received within said spacing, an axially driveable fastener carried on said bracket . . . .

Id.

As stated in the Markman Order, "the fastener system must be positioned on one of the guide walls that constitute the wall guide. The fastener system must include a bracket, disposed to oppose the external surface of the trough wall when the trough wall is inserted in the coupler. Therefore, the bracket must be positioned on the outer guide wall. The fastener system must not

be positioned on a central rib." Markman Order at 15. The axially driveable fastener is construed to mean "a fastener that rotates about a central axis when driven." Id. at 17.

Panduit maintains ADC can establish neither literal nor doctrine of equivalents infringement, while ADC submits evidence in support of both theories, contending the claims survive summary judgment.

**1. Literal Infringement**

The accused products, Panduit asserts, literally include neither a "fastener system positioned on [the] wall guide," nor an "axially driveable fastener," as required by claim 1. In the Markman ruling, the Court held that the former element "must be positioned on one of the guide walls that constitute the wall guide . . . [and] must include a bracket . . . positioned on the outer guide wall." Markman Order at 15. Further, such "fastener system must not be positioned on a central rib." Id. Panduit contends that the accused devices do not literally infringe this element because both place the fastener system on the central rib rather than on the outer guide wall. ADC argues, on the basis of its expert opinions, that the position of Panduit's fastener system is, in fact, on the outer guide wall, even if concomitantly integral to the central rib.

Any assertion of literal infringement of this claim belies the claim construction, which makes clear that the fastener recited in the '781 patent may not be met literally by a fastener on the central rib. Id. Such argument is foreclosed by the Court's previous finding that "[t]he central enforcing rib is distinct from the wall guide." Id. Even a cursory visual inspection reveals that the fastener system of the accused products is positioned directly on the central rib, as that term is used in the '781 specification, such that it cannot be positioned on the wall guide and accordingly cannot literally infringe the '781 patent. See Southwall, 54 F.3d at 1575

(reciting that literal infringement requires that each limitation be present exactly in the accused device).

### 2. Doctrine of Equivalents

Panduit advances several arguments against ADC's ability to reach the jury on its claim of infringement by equivalents. First, Panduit again claims the all-limitations rule prohibits considering the accused device to be an equivalent of the patent. Second, it asserts that ADC is barred by prosecution history estoppel. Lastly, Panduit contends the differences between the relevant elements of the '781 patent and the accused devices are substantial and therefore there is no infringement as a matter of law.

#### a. All-Limitations Rule

According to Panduit, allowing ADC to claim that Panduit's fastener system, decidedly not positioned on the central rib, is equivalent to the claimed position on the wall guide, would entirely eliminate the material limitation of "a fastener system positioned on [the] wall guide." See Warner-Jenkinson, 520 U.S. at 29; Cooper, 291 F.3d at 1322.

In response, ADC reasons that Panduit's argument effectively eviscerates the doctrine of equivalents by ironically prohibiting a theory of equivalency when an accused product does not literally include a claim element. Citing the previously discussed Wright Medical case, ADC urges that permitting it to assert the doctrine of equivalents would not vitiate the fastener system limitation, because both the claimed invention and the accused device employ fastener systems but position them in insubstantially different spots.

While the Court agrees that broad application of the all-limitations rule contravenes the purpose and utility of the doctrine of equivalents, the relevant limitation of this patent presents a

situation much more analogous to the recent Cooper decision than did the claims in the previous patents. See Cooper, 291 F.3d at 1322. Like the patentee in Cooper, ADC has specifically claimed a particular position for a claim element, here, the fastener system, thereby excluding, according to the Federal Circuit, alternate equivalent positions. See id. In Cooper, the Federal Circuit concluded that a claim specifying the position of a workover port as "between the two plugs" prohibited the plaintiff from alleging a port "above" the two plugs was equivalent. Id. To do so, the court stated, would vitiate the "between the two plugs limitation." Id. The Markman Order makes clear that in the '781 patent, ADC distinguished between the wall guide and the central enforcing rib. Markman Order at 15 (stating "[t]he central enforcing rib is distinct from the wall guide"); See The 781 patent, col. 4:22. Claim 1 explicitly positions the fastener system "on said wall guide," as the claim at issue in Cooper specified the location of the post to be "between" the plugs, thereby foreclosing an equivalent not expressly in such a position. Because the Court interpreted, based on ADC's terminology in the patent specification, the "wall guide" element not to include the adjacent central rib, to find the accused fastener, positioned on the central enforcing rib, an equivalent would contradict the rule of Cooper. See Cooper, 291 F.3d at 1322. According to Cooper, a patentee's decision to claim only a specific position necessarily excludes alternatives from the claim, such that the Panduit fastener, not positioned on the wall guide, may not be equivalent as a matter of law. Id.

Accordingly, because literal infringement is precluded by the language of the claim, as interpreted by the Court, without a doctrine of equivalents claim, ADC cannot establish infringement of the '781 patent by the accused devices. Therefore, judgment of non-infringement as a matter of law is granted to Panduit on this patent.

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

(1) Panduit's Motion for Summary Judgment of invalidity and non-infringement as to the '181 Patent [Docket No. 89] is **GRANTED** as to literal infringement by the modified accused device but **DENIED** as to literal infringement by the unmodified accused device, invalidity, and infringement under the doctrine of equivalents;

(2) Panduit's Motion for Summary Judgment of non-infringement as to the '243 Patent [Docket No. 92] is **DENIED**; and

(3) Panduit's Motion for Summary Judgment of non-infringement as to the '781 Patent [Docket No. 86] is **GRANTED**.

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Dated: December 11, 2002